639 A.2d 194

**James J. WHITE III**

v.

**STATE of Maryland.**

**No. 1960, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 6, 1994.

2

**4**

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief) Baltimore, for appellant.

Sarah E. Page, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Susanne Hayman, State's Atty., for Kent County, Chestertown, on the brief), for appellee.

Submitted before BISHOP, GARRITY and HARRELL, JJ.

HARRELL, Judge.

Appellant, James J. White, III, was charged with theft over $300 (count one) and fraudulent misappropriation by a fiduciary (count two). A jury in the Circuit Court for Kent County (Wise, J. presiding) convicted appellant of both charges. The court imposed two concurrent three year sentences, with all but one year suspended, and a $1,000 fine. The court also placed appellant on five years supervised probation, during which appellant must complete 1,000 hours of community service. Appellant filed a timely notice of appeal to this Court.

### Issues

Appellant raises the following issues, which we reorder as follows:

I.   Was appellant improperly convicted of theft and fraudulent misappropriation by a fiduciary?

II.  Did the trial court err when it refused to permit the testimony of an expert witness?

III. Did the trial court err when it refused to explain the meaning of "willfully and fraudulently" to the jury?

IV.  Did the trial court err when it sentenced appellant to perform 1,000 hours of community service?

V.   Did the trial court use an improper basis when it imposed the sentence?

### Facts

In 1981, appellant opened a trust account—a $5,000 certificate of deposit—at People's Bank of Kent County, Maryland under the name "James J. White, III, Attorney Trustee for Larry Davis Steward, Minor and Marlene E. Steward and the survivor of them subject to the order of James J. White, III." When the certificate of deposit matured in 1983, appellant reinvested the balance in another certificate of deposit titled "James J. White, III, Attorney Trustee for Larry Davis Steward, Minor and Marlene E. Steward and the survivor of

them subject to the order of James J. White, III." That certificate of deposit matured in 1987; appellant then reinvested the balance in a certificate of deposit titled "James J. White, III, Attorney Trustee for Larry Davis Steward, Minor and Marlene E. Steward, Subject to the order of James J. White, III." In 1989, appellant closed the account and deposited the trust funds (then $10,252.20) into a money market account at The Chesapeake Bank and Trust Company. That account was titled "JAMES J. WHITE, III, ATTY TRUSTEE FOR LARRY DAVIS STEWARD."

Beginning in September 1989, appellant made numerous withdrawals from the money market account. Some of the withdrawn funds were deposited directly into appellant's business account, and others appellant received in cash. These transactions are itemized as follows:

| DATE | AMOUNT | DESTINATION |
|------|--------|-------------|
| 8–30–89 | $1,500.00 | Bus. Acct. |
| 8–30–89 | 500.00 | Cash |
| 9–26–89 | 2,000.00 | Bus. Acct. |
| 10–05–89 | 1,000.00 | Bus. Acct. |
| 10–05–89 | 1,000.00 | Cash |
| 11–06–89 | 1,000.00 | Cash |
| 11–13–89 | 1,000.00 | Cash |
| 4–09–90 | 1,600.00 | Cash |
| 5–07–90 | 850.00 | Cash |

The 29 June 1990 account statement indicated an account balance of $238.29.

In October and November 1990, someone from appellant's law office deposited a total of $13,800 into the money market account. Those funds were derived from sources wholly unrelated to the administration of the Steward trust. As of 31 December 1990, the account balance was $14,167.68.

Other facts will be included in the discussion, *infra*, as necessary.

### Discussion

### I

The trial court instructed the jury that appellant could be convicted of both theft—the "obtaining or exerting unautho-

rized control" variety—and fraudulent misappropriation by a fiduciary. A person commits the offense of theft by obtaining or exerting unauthorized control when

he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner, and:

(1) Has the purpose of depriving the owner of the property; or

(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

Md.Ann.Code, art. 27, § 342(a) (1992) (hereinafter "§ 342"). Further, the "fraudulent misappropriation by a fiduciary" statute provides:

If any executor, administrator, guardian, committee, trustee, receiver or any fiduciary shall fraudulently and wilfully appropriate to any use and purpose not in the due and lawful execution of his trust, any money or any other thing of value which may come into his hands as such executor, administrator, guardian, committee, trustee, receiver, or in any other fiduciary capacity, or secrete it with a fraudulent intent to appropriate it to such use or purpose, he shall be deemed guilty of embezzlement, and shall be punished upon conviction by imprisonment in the penitentiary for not less than one year nor more than five years.

*Id.* at § 132 (hereinafter "§ 132" or "Section 132"). Appellant argues that he was improperly convicted of both offenses.

### A

Before embarking on any analysis of appellant's contention, we ordinarily would first consider the State's assertion that this issue has not been preserved for appellate review. Due to the application of *Burroughs v. State*, 333 Md. 614, 636 A.2d 1009 (1994), *infra,* however, we do not need to resolve the

State's preliminary assertion because we will not reach the merits of appellant's argument in any event.

## B

As happens occasionally, the Court of Appeals has seemingly blazed the trail while we were pondering which route to take. *State v. Burroughs*, 333 Md. 614, 636 A.2d 1009 (1994) has illumined the path we shall travel in addressing appellant's first issue. *Burroughs* involved an accountant/insurance agent who, under the guise of advising his clients, a husband and wife, regarding retirement planning, received from the clients the proceeds of a loan secured by their home ostensibly to purchase an annuity-type insurance policy. Instead of purchasing the policy, Burroughs negotiated the clients' check to another party. When the clients became suspicious of what Burroughs did with their money, they met with Burroughs. At that time, Burroughs convinced the clients to give him another sum of money based on his promise to return that sum to them within one month and that he would pay-off one of the trusts on their home, a trust that he had previously caused to be placed without the clients' consent or knowledge. Burroughs did not perform as promised. He was subsequently convicted of multiple counts of theft by deception (art. 27, § 342(b)) and of embezzlement by a fiduciary (art. 27, § 132). He was sentenced to consecutive terms of fifteen years imprisonment on two theft convictions, and given concurrent sentences of five years each on two embezzlement convictions.

In *Burroughs*, the Court did not decide whether the convictions under § 342(b) and § 132 were inherently inconsistent ("we need not resolve this question, however, because under the facts of this case, the outcome will be the same whether the verdicts are considered to be inconsistent or consistent") 333 Md. at 623, 636 A.2d 1009.[1] Instead, after applying the

---

1. We note, in passing, that the Court read our holding in *Mattingly v. State*, 89 Md.App. 187, 597 A.2d 1027 (1991), *cert. denied*, 326 Md. 177, 604 A.2d 444 *cert. denied*, —— U.S. ——, 113 S.Ct. 211, 121 L.Ed.2d 151 (1992), as not encompassing a determination "that the two offenses are

required evidence test and finding no match, the Court relied on the rule of lenity in determining that "the doctrine of merger by legislative intent would dictate that the convictions of § 132 merge into the convictions of § 342." 333 Md. at 626, 636 A.2d 1009.

Although the Court in *Burroughs* was specifically presented with convictions under § 342(b) and § 132, while White stands convicted of violations under § 342(a) and § 132, we can identify no compelling distinction for applying a different approach, although reaching a somewhat different result in the instant case. We note that most of the Court's relevant reasoning and conclusions in *Burroughs* addressed § 342 as if encompassing all of its subsections.

If we were to apply the required evidence test to White's situation, we would reach the same result as in *Burroughs*. In applying the required evidence test, we are directed as follows:

inherently inconsistent." 333 Md. at 621, 636 A.2d 1009. Although, for what it is worth, we do not necessarily agree with this reading, we do believe that the facts in the case *sub judice* and those in *Mattingly* are materially distinguishable. In that case, the State Highway Administration erroneously sent Mattingly, an "associate" of two related construction companies, two checks in payment of three road construction contracts. We explained that if Mattingly

received the checks ... believing that he was entitled to them, then he could not be a thief, but would hold the checks in a fiduciary capacity. If, on the other hand, Mattingly knew that he was not entitled to the money when he received it, he could not hold it as a fiduciary because he would be holding it as a thief.

*Id.* The jury rejected Mattingly's good faith and honest belief defenses and determined that he deposited the checks into the companies' operating accounts knowing that the companies were not entitled to the money. Thus, we reversed, *inter alia*, the § 132 convictions because Mattingly's "status as a thief preempt[ed] his status as a fiduciary." *Id.* 89 Md.App. at 200, 597 A.2d 1027.

In the case *sub judice*, appellant did not receive money or anything of value from a third party and divert it to his own use; rather, appellant dipped into a trust account of which he was trustee for nearly a decade and fraudulently appropriated the funds to an unlawful use. Left to our devices, we would not extend the fact-specific holding in *Mattingly*, where we did not have an opportunity to explore the relevant legislative history, to the facts *sub judice*.

The required evidence is that which is minimally necessary to secure a conviction for each statutory offense. If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, the offenses are not the same for double jeopardy purposes, even though arising from the same conduct or episode. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, the offenses are deemed to be the same for double jeopardy purposes.

*Thomas v. State,* 277 Md. 257, 267, 353 A.2d 240 (1976). Thus, we must examine the elements of each crime to determine whether all the elements of one crime are present in another.

■ White's convictions could not merge under the required evidence test because theft requires proof of an intent to deprive permanently, and fraudulent misappropriation does not. Fraudulent misappropriation does, however, require that a fiduciary fraudulently appropriate property to another's use, whereas theft does not specifically contain any of those elements. Thus, there is an elemental difference between the two offenses for purposes of the application of the required evidence test.

■ Although these offenses do not merge under the required evidence test, it would nonetheless be appropriate to hold that they merge under the rule of lenity. The theft conviction in this case was based on the same conduct that gave rise to appellant's other conviction. Because the Legislature reenacted § 132 following its enactment of the omnibus theft statute and arranged for coincident effective dates as to the repeal of § 132 on one hand and its reenactment on the other, and due to the linking legislative history of how it came to do so (as discussed in *Burroughs* 333 Md. at 624–626, 636 A.2d 1009), we would agree, even in the absence of *Burroughs,* that it was the Legislature's intent that "convictions of § 132 merge into the convictions of § 342." Burroughs, at 626, 636 A.2d 1009. Indeed, as the Court of Appeals observed:

It seems apparent from our review of the legislative history that the General Assembly believed § 342(a) to be sufficiently broad to embrace embezzlement, and that it reenacted § 132 only as a fail-safe measure, so that there would be no gap in the coverage of the criminal law if the Attorney General's fears were well founded. In fact, § 342(a) is sufficiently to (sic) broad to embrace within its proscription the various forms of embezzlement formerly addressed by specific statutes, including § 132, and the precautionary reenactment of § 132 was unnecessary.

*State v. Burroughs, id.* at 626, 636 A.2d 1009.[2] We conclude that the sentence for fraudulent misappropriation by a fiduciary must be vacated under the rule of lenity. Accord *State v. Burroughs,* 333 Md. 614, 624–626, 636 A.2d 1009 (1994).

■ Special comment concerning *State v. Burroughs, supra,* must be made regarding the application of merger there as opposed to the instant case. In *Burroughs,* the Court, applying the rule of lenity, as we have done in the instant case with White's convictions under § 342(a) and § 132, determined that "the doctrine of merger by legislative intent would dictate that the convictions of § 132 merge into the convictions of § 342." 333 Md. at 626, 636 A.2d 1009. Ordinarily, the application of the doctrine of merger is employed at or to the sentencing phase of a judgment in a criminal case ("... the very notion of a merger is something designed simply to avoid multiple punishment. It is not the case that the defendant is not guilty of the lesser offenses; it is rather the case that he is guilty of those lesser offenses but simply is not to be twice punished," Richard P. Gilbert & Charles E. Moylan, Jr., Maryland Criminal Law: Practice & Procedure § 37.9, at 453 (1983). That is the understanding that we apply to the case *sub judice.* We perceive the Court of Appeals's executory direction in *Burroughs* to "vacate the sentences *and convic-*

---

**2.** Although appearing in *Burroughs's* discussion of the merger doctrine, this language may also presage the Court's view if, as, and when it squarely confronts the issue of whether such verdicts are inherently inconsistent.

*tions* for embezzlement by a fiduciary" 333 Md. at 626, 636 A.2d 1009; (emphasis supplied) was tailored to *Burroughs'* fact-specific context and the explicit assumption that if the verdicts there were inconsistent such an error would be fully corrected if the sentence and conviction were vacated, 333 Md. at 623, 636 A.2d 1009. Because the Court found merger via the rule of lenity to be appropriate, the Court did not perceive a need to confront directly the inherent inconsistency argument by virtue of having vacated the convictions as well as the sentences.

It may also be possible that, in speaking of the merger of the "conviction," the Court in *Burroughs* meant that the *judgment* of conviction would merge; i.e., that the verdict entered on the § 132 count could stand but that no judgment could be entered on it. That result would, it seems to us, adequately effectuate the Court's purpose of precluding both double punishment and the collateral consequences of a *judgment* of conviction on the merged offense without erasing a lawful finding of fact on a charge properly submitted to the trier of fact. That finding—the verdict—should remain intact in the event the judgment on the inclusive offense is later vacated either by some higher court or on a collateral attack. We have, of late, expressed that kind of disposition by vacating the sentence, which serves to vacate the judgment of conviction, but affirming the "conviction," meaning the finding of guilty—the verdict. Absent some clearer direction from the Court of Appeals to the contrary, we shall continue to follow that course.[3]

_____

**3.** We are unwilling to predict whether the Court in *Burroughs* would have reached the merits of the inherent inconsistency in verdicts argument had it applied the doctrine of merger, in its traditional sense, solely to the sentences flowing from the guilty verdicts on the fiduciary embezzlement counts. Our notation of this question stems from an observation that the underlying symmetry of *Burroughs's* avoidance of the merits seems to rest on the proposition that "... the outcome will be the same whether the verdicts are considered to be inconsistent or consistent ... If the verdicts are inconsistent, as the defendant contends, the error is rectified by vacating the sentence *and conviction* of

## II

█ Appellant also argues that the trial court erroneously excluded the testimony of an expert witness. "The admission or exclusion of evidence is left to the sound discretion of the trial judge. Moreover, a trial judge may exclude evidence deemed to be cumulative." *Lomax v. Comptroller of the Treasury,* 88 Md.App. 50, 54, 591 A.2d 1311 (1991) (citation omitted). Although the admissibility of expert testimony may be reviewed on appeal, the court's determination may be reversed only "if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion." *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 332, 389 A.2d 887 (1978).

Appellant called as a witness Richard Vincent (Vincent), Director of the Lawyer Counseling Committee of the Maryland State Bar Association. The State renewed its motion to exclude the witness's testimony and argued that he had no personal knowledge of the events in question. Appellant argued that State's Exhibit # 58—an agreed statement of facts used in appellant's disciplinary proceedings which was admitted into evidence in the case *sub judice* without objection—"opened up the door." That statement included the following:

Respondent testified at the hearing herein, as did Richard B. Vincent . . . that Respondent suffered from severe alcoholism until on or about January 1992 when he contacted the Director of Lawyer Counseling for help. . . . The Respondent testified that at the times he wrongfully took the subject trust funds, he rationalized his behavior or justified it as borrowing. The Director of Lawyer Counseling testified, in his expert opinion, that such rationalization or justification was consistent with alcoholic thinking.

Appellant also claimed that Vincent, an expert in the treatment of alcoholism and its effect upon an individual, would be

---

the embezzlement counts." 333 Md. at 623, 636 A.2d 1009 (emphasis supplied).

able to testify concerning the effect appellant's alcoholism had on his ability *vel non* to form the specific intent necessary to commit the alleged offenses.

The trial court and counsel examined Vincent out of the jury's presence. Vincent testified that appellant was first referred to him in April 1981 and that he had "sort of kept tabs on [appellant] since then." During the period of February 1989 through October 1990, Vincent saw appellant only two or three times, but had heard from local lawyers and judges, and inferred from appellant's divorces and DWI's, that appellant was drinking uncontrollably. Appellant's counsel asked Vincent:

Q  Can you testify what the effect of that drinking alcoholically had on him in those periods?

A  Well, the accepted, at least by the American Medical Association, and in general, that alcoholism is a disease that affects the decision making process in human beings. It affects the hypothalamic glandular system that determines how we think, in a right and wrong situation, and that a person can function obviously—Mr. White functioned to some degree for years. But it's a progressive illness and that it got worse and worse and his drinking became more and more uncontrollable. And that intoxication affects your decision-making process.

Q  In what way?

A  You do not—you do not comprehend. In what way? You do not—it affects your ability to think with what you have been given physically, a sober brain. It's sedated. Your thinking process is sedated to some degree.

Q  In 1989–1990 was Mr. White's thinking ability impaired as a result of alcoholism?

A  To my knowledge the reports that came to me in that period of time and previously, all of the situations in which he became involved are textbook symptoms of alcoholism.

Q  Is your answer yes?

A   Yes.

The State then posed the following questions:

Q   But your last answer wasn't based on your personal knowledge?   Your day-to-day knowledge of Mr. White?

A   Yeah.   I do not live in Chestertown, right.   I did not see him day-to-day.

\* \* \*

Q   Do you know whether or not Mr. White could form the specific intent to permanently deprive the holder of the trust fund of $2,000 on August 30th of 1989?

A   Do I?   The answer is, I believe he had the ability to form that intent.   I do not think he did.

Q   Do you know whether he could on this particular day?

A   Form that intent?

Q   Yes?

A   I—I'm sorry, unless he was unconscious he could form the intent.   I don't understand the question.

Q   You answered the question. . . .

The court refused to permit Vincent's testimony.

Appellant then testified that, during the period in question, he "drank on a daily basis, every day, seven days a week, an average of at least a case of beer to three cases of beer, to a quart of whiskey, to half-a-gallon of whiskey every day, depending on the number of hours that [he] was awake."   Appellant was of the opinion that he did not have the specific intent to deprive permanently the owner of the funds when he made the withdrawals;   rather, he intended "[t]o replace the funds along with the interest they would have earned when [he] had received fees ... earned in other cases."

Appellant renewed his request that Vincent be permitted to testify.   The request was again denied.

MR. MOWELL [appellant's counsel]:   It was my understanding the Court said that we needed a foundation, that Mr. White could take the stand and say how much he had been drinking during that period of time.   That was the foundation for Mr. Vincent's testimony.

THE COURT: No. I never said that. I said that no matter how long we stayed here, Mr. Vincent would never have a foundation because he did not have any contact with Mr. White during the period of time specific intent is relevant. What I said was that Mr. Hughes might have that basis of observation, even though he doesn't profess any expertise in "alcoholism in general". That Mr. White himself might be able to testify that on given days or times, the given days or times being those in question here, his cognitive abilities were or were not affected by the consumption of alcoholic beverages. Nothing has happened that gives Mr. Vincent any more of a foundation with regard to the specifics of this particular case, and it never will unless we rewrite history. Mr. Vincent still is a general witness dealing with the general effects on most people or some people, of alcoholism, which will never be relevant to specific intent of this specific individual, in this specific case. And I don't think that's the first time I've said that, but maybe I have failed in my articulation abilities.

MR. MOWELL: Your Honor, okay. We would make a proffer that Richard Vincent would testify that through his personal knowledge of the Defendant, he knew he was an alcoholic, and that but for the alcoholism he would not have withdrawn the trust funds.

THE COURT: Alright. That proffer will be in the record, but it is not relevant information or evidence.

MR. MOWELL: The Court will not permit Mr. Vincent to testify, is that right?

THE COURT: That's right.

MR. MOWELL: Okay.

THE COURT: Well, obviously he may know things that I don't know, but based on what's been proffered to me, and what the issues in the case are, he has not—he is not admissible nor is his testimony.

■ First, the summary of Vincent's testimony contained in the agreed statement of facts used in appellant's disciplinary proceedings did not "open the door" as appellant claims. Had

the court allowed Vincent to testify, and Vincent repeated what was already contained in the agreed statement of facts, his testimony would have been merely cumulative. Thus, the trial court properly exercised its discretion and refused to admit cumulative evidence. *See Ali v. State,* 314 Md. 295, 307, 550 A.2d 925 (1988) (court's refusal to admit police report not an abuse of discretion because it was unnecessary and cumulative); *Harvey v. George J. Roche & Son,* 148 Md. 363, 366–67, 129 A. 359 (1925) (where testimony of witnesses before Workman's Compensation Commission was read to the jury, court properly refused to allow same witnesses to repeat that testimony).

■ Further, any elaboration on, or explanation of, that testimony would have been irrelevant to the issue of whether appellant, during the period in question, was capable of forming the requisite specific intent. In other words, Vincent's proffered testimony would not have been of appreciable help to the jury. *See* 6 Lynn McLain, *Maryland Evidence* § 702.1 (1987).

"[T]he degree of intoxication which must be demonstrated to exonerate a defendant is great. Evidence of drunkenness which falls short of a proven incapacity in the accused to form the intent necessary to constitute the crime merely establishes that the mind was affected by drink ... and does not rebut the presumption that a man intends the natural consequences of his act."

*Shell v. State,* 307 Md. 46, 61–62, 512 A.2d 358 (1986) (*quoting State v. Gover,* 267 Md. 602, 607–08, 298 A.2d 378 (1973)). Vincent testified during the offer of proof that, although appellant's alcoholic drinking affected his ability to think in 1989 and 1990, appellant was able to form the requisite specific intent. Thus, the court properly excluded the testimony.

Appellant also argues that Vincent's testimony would have corroborated appellant's testimony that he lacked the specific intent to deprive permanently the Stewards of their money. In *Simmons v. State,* 313 Md. 33, 542 A.2d 1258 (1988), the

Court of Appeals addressed this issue in the context of a second degree murder prosecution. Before trial, the State made a motion *in limine* that the testimony of Simmons's expert, a psychiatrist, be excluded. Simmons proffered that his expert "would only testify that Simmons's asserted subjective belief [that he feared for his life] would be consistent with his psychiatric profile." *Id.* at 36, 542 A.2d 1258. The trial court nevertheless granted the State's motion. At trial, Simmons met his burden of production on the defense of imperfect self-defense, testifying "that he was afraid of the victim and that he had been stabbed in the past by another individual." *Id.* at 39 n. 2, 542 A.2d 1258.

The Court of Appeals reversed, holding that "the proffered testimony has some relevance in that consistency between the specific subjective belief testified to by Simmons and Simmons's psychological profile tends to make it more likely that Simmons in fact held that subjective belief." *Id.* at 48, 542 A.2d 1258. In the case *sub judice,* however, appellant did not proffer that Vincent would provide a psychological profile of appellant. At most, Vincent could testify as to the general effects alcohol has on a person's ability to think. Further, as discussed in the preceding paragraph, Vincent gave the opinion that appellant *could* form the specific intent. We perceive no error.

### III

Appellant next argues that the trial court erred when it failed to instruct the jury adequately as to the meaning of "willfully and fraudulently" as those terms are used in § 132. The court, appellant claims, "gave only a superficial description of 'fraudulent' and ... made no attempt to define 'willful.'" Because we have determined in our resolution of Issue I to vacate appellant's sentence, but not his conviction, under § 132, we shall address this issue. We find no merit in appellant's contention.

Maryland Rule 4–325(c) provides: "The court may, and at the request of any party shall, instruct the jury as

to the applicable law and the extent to which the instructions are binding.... The court need not grant a requested instruction if the matter is fairly covered by instructions actually given." The requirements of this rule are mandatory; the failure to give a requested instruction that correctly states the applicable law and that has not been fairly covered in instructions actually given is error. *See Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984). Jury instructions are nevertheless viewed as a whole—within the context of all the instructions given—and not in isolation. *See Jones v. State,* 310 Md. 569, 589, 530 A.2d 743 (1987), *vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988).

In the case *sub judice,* as we earlier related, the court gave the following instruction:

> Now in Count # 2 the Defendant is charged with the crime of misappropriation by a fiduciary. In order to convict the Defendant on this charge, the State must prove, first, that the Defendant was an executor, administrator, guardian, trustee or receiver. Second, that the Defendant was entrusted with money belonging to another. Three, that the Defendant willfully used or secreted the money for a purpose other than that for which it was intended. And fourth, that the Defendant acted fraudulently. A defendant acts fraudulently if he intends to promote a personal interest of someone other than the person who entrusted him, or her with the money. It's not necessary for the State to prove that the owner of the money actually lost, or that the Defendant actually gained as a result of the misappropriation.

This instruction is nearly identical to MPJI–Cr 4:22. *See* MICPEL, *Maryland Criminal Pattern Jury Instructions* 295 (1991). The court continued:

> Those crimes [theft and fraudulent misappropriation by a fiduciary] involve the element of intent. Intent is a state of mind and ordinarily cannot be proven directly, because there is no way of looking into a person's mind. Therefore a Defendant's intent may be shown by surrounding circum-

stances. In determining a Defendant's intent you may consider a Defendant's acts and statements, as well as the surrounding circumstances. Further, you may, but are not required to infer that a person ordinarily intends the natural and probable consequences of his or her acts and/or omissions. Specific intent involves more than a general intent to perform a particular act. To establish specific intent the State must prove that the Defendant knowingly did an act which the law prohibits, intending a result which is prohibited by law. Since the Defendant is charged with the violation of laws, an element of which is specific intent, you must find that the Defendant specifically intended to violate the law in question in order to convict him. If the State fails to prove beyond a reasonable doubt that the Defendant specifically intended the violation with which he is charged, you must find him not guilty.

We hold that the instructions given, taken as a whole, fairly and adequately stated the applicable law. It was not necessary for the court to elaborate any further on the term "fraudulently." Further, the element of wilfulness, which is commonly interpreted as meaning that the defendant acted intentionally, *see Shell v. State*, 307 Md. 46, 67, 512 A.2d 358 (1986), was covered adequately in the specific intent instruction. *See Stathes v. State*, 29 Md.App. 474, 481–84, 349 A.2d 254 (jury instructions for § 132 held to be adequate even though the trial court defined neither "fraudulently" nor "wilfully"), *cert. denied*, 277 Md. 741, *appeal dismissed*, 429 U.S. 803, 97 S.Ct. 36, 50 L.Ed.2d 64 (1976).

### IV & V

Based on the holdings in Sections I through III, *supra*, we shall vacate the sentence imposed for the fiduciary embezzlement conviction. We address, however, the sentencing issues, as raised by appellant, as to the theft conviction.

As a condition of appellant's probation, the court ordered that appellant perform 1,000 hours of community service in a non-legal capacity for either the Legal Aid Bureau

or the Public Defender's Office. Appellant argues that this condition (1) "acts as an additional fine in that Appellant must forego the chance to earn a living in order to perform the community service" and (2) is unreasonable as demonstrated by the court's denial of appellant's request that an appeal bond be set. We disagree.

██ "A judge has very broad discretion when imposing ... conditions of probation. Article 27, § 639(a) authorizes the court to suspend sentences and establish such conditions 'as may be deemed proper.' " *Brown v. State,* 80 Md.App. 187, 198, 560 A.2d 605 (1989). An appellate court will only disturb the trial court's exercise of discretion if the conditions of probation are unreasonable or without a rational basis, *i.e.,* when they are the product of arbitrariness or capriciousness. *See id.*

In the case *sub judice,* the community service is rationally related to appellant's rehabilitation. The court explained during the disposition hearing:

[T]he probation conditions I am putting on you [sic], Mr. White, are partly designed to help rehabilitate and restore your, your confidence in yourself and may be [sic], inferentially, incidentally, the confidence of the public and [sic] you. Because whether you are here or in Montana, what you think of yourself is going to be the same. If you don't have any self esteem, if you haven't managed to rise above the past and live again, it will not matter what state or what country you are in, your problems will be the same. And frankly, with all you have got on you, your temptation to go back to the bottle is great. I think the best protection against that is the people around here that have invested so much in you. And as I think you know, it is my impression that the people who instigated these proceedings in greater or lesser degree did it not because they didn't like you, but because they did like you. And I think they would like to see it. And I think they will be here to help you. And I think you sort of owe it to them to let them do that.

Clearly, the court's primary motivation for the community service was to restore appellant's self-confidence. The community service was neither intended as, nor has the incidental effect of being, a fine. Appellant has five years—the entire term of probation—to serve 1,000 hours. This equates to just under seventeen hours per month. It can hardly be said that this impairs appellant's ability to earn a living.

Further, the fact that the trial court denied appellant's request for an appeal bond has nothing to do with the reasonableness *vel non* of the conditions of probation. The request for an appeal bond was denied because the court determined that an appeal would be frivolous and that appellant had no pressing matters to attend to prior to incarceration. Under the facts and circumstances of this case, we hold that the court did not abuse its discretion when it imposed 1,000 hours of community service as a condition of probation.

■ Appellant also argues that the trial court impermissibly referred to other unrelated cases during the course of the disposition hearing. Appellant points to the following statements the court made:

Now the flip side of this, Mr. Mowell says that, you know, you are disgraced and whatever else—and you said it, too—and that, in effect, society and people are picking on you. Well, let me tell you something. There are at least two cases—I can't give you the names—in Elkton where lawyers' secretaries stole from them, and they are doing long time. Because you see it is different if the lawyers are the victims. These lawyers were disgraced. Their monies, you know, they had to pay this back. Some of it wasn't covered by insurance. And these people who worked for them cleaned them out. And far from asking for suspended sentences, I don't think those secretaries, if they hadn't worked for lawyers, would have even gotten the sentences they did. So I think it is a question to some extent of whose ox is getting gored. Because it wasn't much question in my mind I was shocked at the sentence that those secretaries got. And I think it was because it was lawyers were the

ones who were stolen from. Somehow when a lawyer does the stealing, it is supposed to be looked at differently. And I think the people in society think that is true—that we have a double standard and it is lower for lawyers, when, in fact, it should be higher.

We find no merit in appellant's contention.

▮▮▮▮▮▮ It is well-settled that "a sentencing judge is vested with virtually boundless discretion." The sentencing judge is accorded this broad latitude to best accomplish the objectives of sentencing—punishment, deterrence and rehabilitation. A sentence should be premised upon the facts and circumstances of the crime itself and the background of the individual convicted of committing the crime.

*Smith v. State*, 308 Md. 162, 166, 517 A.2d 1081 (1986) (*quoting Logan v. State*, 289 Md. 460, 480, 425 A.2d 632 (1981)) (citations omitted). The sentencing judge cannot, however, be motivated by prejudice, ill-will, or any other impermissible consideration. *See id.* at 169, 517 A.2d 1081.

Appellant's counsel argued in his opening statement, his closing argument, and in mitigation during sentencing, that appellant was being treated more harshly because of his status as an attorney. At the disposition hearing, the prosecutor argued that, even though a fellow attorney was the defendant, she had "an obligation to treat Mr. White as [the State] would treat any other individual who committed this type of an offense." In response, appellant's counsel argued that had appellant not been an attorney he would have received more lenient treatment. The court's statement was merely made in response to counsels' arguments. It is clear that the court did not base its decision on any other cases, or on any facts and circumstances other than those developed during the case *sub judice*. The court made clear that it was treating appellant the same as any other defendant:

It would be wrong for me to sit here and say, "Okay, Mr. White, we are going to make an example out of you. We are going to ..." I think that has probably already been

done. But I think what we can't do ... because once you allow a secretary for one lawyer to steal and walk the streets and get away with it, she and or other lawyers' secretaries become maybe more tempted. The same logic is true in your case. If we say to lawyers, "Hey, look. You have got a drinking problem. Okay, steal. Then we will deal with your alcohol problem and kind of wink at the theft. If you pay the money back before the Grievance Commission gets on you, no sweat. We will take care of it." If we are going to have that law for lawyers, why don't we have it for everybody? And the fact is, we don't. And I hope we never will.

> *So what I am trying to say to you, Mr. White, is, you will be treated the same as anybody else. No more, no less.*

(Emphasis added). In fact, the sentence the court imposed fell within the sentencing guidelines of one to three years. We hold that the sentence was not motivated by an impermissible consideration.

SENTENCE AS TO COUNT 2 VACATED; JUDGMENT AS TO COUNT 1 AFFIRMED; COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY KENT COUNTY.

BISHOP, J., dissents.

BISHOP, Judge, dissenting.

Because I believe that *Burroughs* requires a reversal of the judgment under Count II, I dissent from that part of the majority's opinion that is the basis for the conclusion that only the sentence as to Count II should be vacated.